WILLIAM D. BAUER *et al.*, Plaintiffs-Appellants, v. THE CITY OF CHI-
CAGO, Defendant-Appellee.

First District (2nd Division)   No. 84—2562

Opinion filed September 24, 1985.—Rehearing denied October 29, 1985.

Raymond P. Concannon, Ltd., of Chicago, for appellants.

James D. Montgomery, Corporation Counsel, of Chicago (Philip L. Bronstein and Maureen Kelly Ivory, Assistant Corporation Counsel, of counsel), for appellee.

PRESIDING JUSTICE STAMOS delivered the opinion of the court: -

Plaintiffs filed a two-count complaint against Raymond Hayes and the city of Chicago (city). The action arose out of an occurrence in which Hayes, while suspended from the Chicago police department, was involved in a shooting with plaintiff Bauer and plaintiff's decedent. The city declined to represent Hayes and filed a motion for summary judgment, which was granted on September 20, 1984. Plaintiffs appeal the entry of summary judgment against them as to the city. Defendant Hayes had been defaulted in early 1984 and, on October 11, 1984, judgment was entered against him in the sum of $1.2 million. Hayes is not a party to this appeal.

The shooting that precipitated this action occurred in the early hours of October 20, 1980. Raymond Hayes' account of the incident indicates that at approximately 2:30 a.m., he and his wife, a black couple, were leaving a movie and driving home through the town of Cicero. At 16th Street and Laramie, Hayes stated that a car occupied by two white men, a white Lincoln Continental, drove up alongside Hayes' car and tried to force him off of the road. The two men yelled to Hayes to "get out of Cicero or we'll kill you." Hayes stated that he tried to ignore these and other threatening remarks.

At 28th and Laramie, the two men again tried to curb Hayes' car. Hayes managed to avoid the white car and drove to 31st and Laramie, where he stopped for a red light. When the two men drove alongside Hayes, he informed them that he was an off-duty Chicago police officer on his way home. Hayes sat through three traffic light changes hoping the two men would drive away. Hayes then stated that the passenger of the white car (Bauer) leaned forward as if to pick something up and yelled that if Hayes did not move his car, he would "blow [his] brains out." Hayes put his car into reverse and tried to escape, but the driver of the white car (Patz) backed his car into Hayes', at which time the bumpers of the cars became locked.

A few seconds after the cars became locked together, Hayes stated that the two men got out of their car with their hands inside their pockets. Hayes stated that he pushed his wife to the floor, got out of his car, and fired 12 rounds from his service revolver in self defense. The two men tried to get back into their auto to escape, but the locked bumpers prevented that attempt. Hayes moved closer to their car and saw that the two men had been shot. He then attempted to flag down passing cars to get police to the scene.

The surviving plaintiff, William Bauer, stated that he was out with his uncle Herbert Patz the evening of the shooting. The two men had visited several bars and had numerous drinks. At about 2:45 a.m., the two were on their way to get something to eat. As they drove south on Laramie in Cicero, their car was cut off by a person driving a red car (Hayes' car). Bauer's uncle then proceeded to cut off the red car. Each car cut off the other a few times as the cars proceeded down the road. When the two cars came to a stop light at 31st and Laramie, the two men drove up alongside of the red car. Patz saw that the driver of the red car had a gun near his steering wheel. Just as Bauer noticed that the man had a gun, Bauer stated that the man jumped from the red car and began shooting. Bauer did not know the race of the man in the red car until Hayes got out of his car and began shooting. There was a phone in Patz' car, but Bauer stated that he did not reach down to use it. Bauer stated that neither he nor his uncle had a weapon, although a can of mace was ultimately found on the floor of the car. Bauer also stated that neither he nor his uncle ever left the car before the shots were fired.

Several witnesses to the incident indicated that they heard the men in the white car use racial remarks directed at the people in the red car. Some witnesses also heard Hayes identify himself as a police officer. Photos of the cars involved in the incident indicated

that the white car's rear fender was touching the red car's front fender. Several witnesses also stated that Bauer and Patz never got out of their car before Hayes began shooting.

The plaintiffs filed a second amended complaint on September 21, 1981, against Raymond Hayes and the city. Count I, sounding in negligence, alleged that the shooting occurred while Hayes was employed by the city and while acting within the scope of his employment and authority as a police officer on October 20, 1980. Plaintiffs admitted that Hayes had been suspended from the department from October 16, 1980, until midnight October 20, 1980. The complaint alleged the negligence of Hayes acting individually and as an agent and servant of the city based upon his unreasonable use of force while making an arrest. The complaint also alleged the negligence of the city in failing to collect Hayes' revolver, shield, badge and identification card, contrary to police regulations.

Count II alleged a violation of plaintiffs' civil rights (42 U.S.C. sec. 1983 (1982)) based upon the excessive use of force in making an arrest. Plaintiff alleged that it is the policy and custom of the Chicago police department to encourage and condone excessive force.

The city, declining to represent Raymond Hayes, filed a motion for summary judgment on January 27, 1984. Plaintiffs filed a response and, on September 20, 1984, the trial court granted judgment in favor of the city and against plaintiffs. The sole question on review is whether the entry of summary judgment against plaintiffs was proper.

Summary judgment is proper if the pleadings, exhibits, affidavits and depositions on file disclose no genuine issue of material fact such that the movant is entitled to judgment as a matter of law. (*Kroll v. Sugar Supply Corp.* (1983), 116 Ill. App. 3d 969, 975, 452 N.E.2d 649.) Upon review of the trial court's entry of summary judgment, the appellate court determines, initially, whether the trial court was correct in ruling that no genuine issue of material fact was raised and, secondly, whether entry of judgment was correct as a matter of law. (*Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 938, 453 N.E.2d 1153.) Summary judgment should be granted "only where the evidence, when construed most strongly against the moving party, establishes clearly and without doubt his right thereto." *Motz v. Central National Bank* (1983), 119 Ill. App. 3d 601, 605, 456 N.E.2d 958.

In moving for summary judgment, the city contended that it was not liable for the actions of Raymond Hayes because at the time of the incident Hayes was officially suspended from the police depart-

ment and could not, therefore, have been acting within the scope of his employment as a Chicago police officer. Plaintiffs contended below and on appeal that questions of fact exist as to whether Hayes was acting within the scope of his employment, that the findings of the Chicago police office of professional standards (OPS) created questions of fact as to whether Hayes was acting within the scope of his employment, and that questions of fact exist as to whether the city's failure to timely obtain the suspended officer's indicia of authority (*i.e.*, shield, badge and identification card) was the proximate cause of plaintiffs' injuries.

The overriding fact in this case is that at the time of the incident in question, Raymond Hayes was suspended from the department for disciplinary reasons. A police officer receives no salary while suspended, and if the suspension covers an entire pay period, the city will not make the premium payment on the member's hospitalization insurance for that pay period. While an officer is suspended from the force, he is "bound by the Rules and Regulations of the Chicago Police Department *** except those rules and regulations which require the exercise of direct police action by a member." Police General Order 75—22, sec. XIV.

Plaintiffs cite a number of cases in support of their position that Hayes was acting within the scope of his employment during the shooting incident. In all of these cases, however, *Andrews v. City of Chicago* (1967), 37 Ill. 2d 309, 226 N.E.2d 597, *Karas v. Snell* (1957), 11 Ill. 2d 233, 142 N.E.2d 46, and *Banks v. City of Chicago* (1973), 11 Ill. App. 3d 543, 297 N.E.2d 343, the officers involved were merely "off-duty," not suspended. Research on this issue does not disclose any case involving a suspended police officer, and neither party cited such a case in their briefs. The cases cited by plaintiffs are not determinative, because it is beyond dispute that the city can be held liable for the actions of an off-duty police officer. However, an officer on suspension from the department is, beyond question, in a qualitatively different position from one merely off-duty. The term suspension was defined by our legislature in the Merit Employment System Act as "the temporary separation of an employee from his/her position for disciplinary reasons." (Ill. Rev. Stat. 1981, ch. 34, par. 860—2(t).) In *Ridenhour v. Mollman Publishing Co.* (1978), 66 Ill. App. 3d 1049, 1051, 383 N.E.2d 803, this court, in a contract case, cited Webster's Dictionary and defined suspension as the "temporary forced withdrawal from the exercise of office." The term "suspension" has also been used, without definition, in the State Police Act (Ill. Rev. Stat. 1981, ch. 121, par. 307.13) and in

the County Police Department Act (Ill. Rev. Stat. 1981, ch. 125, par. 164). The very nature of an employment suspension for disciplinary reasons suggests that a person could not be acting within the scope of his employment because, in essence, that person is not "employed" by the entity during the period of suspension. That idea receives support from the facts here showing that the suspended officer receives no pay and, if the duration of the suspension covers an entire pay period, no medical coverage either.

■ Moreover, Police General Order 75—22 specifically excepts a suspended police officer from those rules and regulations which require the exercise of direct police action, as in the case at bar. The language of that order, contrary to plaintiffs' argument discussed below, clearly prohibits a suspended police officer from engaging in direct police action. The exception is patently designed to relieve a suspended officer from the obligation imposed by departmental regulations which state: "Every member must also be constantly aware that while technically off duty he is subject to respond to any emergency requiring his service." (See *Banks v. City of Chicago* (1973), 11 Ill. App. 3d 543, 549-50, 297 N.E.2d 343 (Police Rule 298 provides that a Chicago police officer is always on duty).) In the general context of the law of master and servant, the "rule of *respondeat superior*, as its terms import, arises out of the relation of superior and subordinate, is coextensive with it, and ceases when the relation itself ceases to exist." (*Orr v. Thompson Coal Co.* (1920), 219 Ill. App. 116, 118.) The above-quoted rule should have no less efficacy when the relation is temporarily suspended for disciplinary reasons. Therefore, this court holds, as a matter of law, that a suspended police officer cannot be acting within the scope of his employment, even if that officer is engaged in direct police action. Consequently, the city cannot be held liable under *respondeat superior* for the actions of such officer. A suspended officer has only the same rights and obligations in preventing and stopping the commission of crime as any private citizen.

■ It should also be noted that even though Hayes may have told people at the scene that he was an off-duty officer, including the victims, those statements neither establish nor change Hayes' employment status at the time in question. As stated in *Holbeck v. Illinois Bankers Life Assurance Co.* (1943), 318 Ill. App. 296, 304, 47 N.E.2d 721, "[A]n agent cannot confer power on himself and his agency or authority cannot be established by showing what he said or did." Similarly, the fact or extent of an agency relationship cannot be proved with evidence of the purported agent's past declara-

tions. *Kapelski v. Alton & Southern R.R.* (1976), 36 Ill. App. 3d 37, 42, 343 N.E.2d 207.

■ Plaintiffs maintain, however, that since the OPS exonerated Hayes of any wrongdoing for the shooting incident, that its determination is a binding admission on the city and created questions of fact as to whether Hayes was acting as a police officer, in the scope of his employment, at the time of the shooting. We disagree.

Following the shooting, the administrator of the OPS, Francis Nolan, initiated formal actions against Hayes alleging two charges: One, failing to surrender his badge and service revolver pursuant to General Order 75—22, sections XIII and XIV; and, two, for unnecessarily discharging his service revolver, striking the victims. A reading of the rule however, reveals that although a sworn member is required not to carry a firearm while on suspension, the rules do not require him to turn in his firearm nor the department to collect it. The investigation resulted in 245 pages of documents and an OPS finding that allegation number one was "sustained," and that Hayes was "exonerated" on allegation number two. Sustained is defined as "allegation is supported by sufficient evidence to justify disciplinary actions." Exonerated is defined as "incident occurred but was lawful and proper." An additional charge against Police Commander Cook for failing to obtain Hayes' badge, identification card and shield as he went on suspension was "not-sustained." Not sustained is defined as "insufficient evidence to either prove or disprove allegation."

As the rules and regulations of the Chicago police department make clear, suspended police officers are duty-bound to conduct themselves in accordance with all departmental rules and are prohibited from engaging in direct police action. (General Order 75—22, sec. XIV(B).) The clear purpose of the OPS investigation was to determine whether any further disciplinary actions should be taken against Hayes. While on suspension for disciplinary purposes, Hayes was required to refrain from any conduct that would violate departmental rules. The investigation by OPS into the propriety of Hayes' conduct on October 20, 1980, and subsequent determination by OPS of "exonerated," has no conclusive effect on the issue of whether Hayes was acting within the scope of his employment. As stated in *Karas v. Snell* (1957), 11 Ill. 2d 233, 142 N.E.2d 46: "For disciplinary purposes [the police officer] may well be subject to the surveillance of the police authorities at all times, and obliged to conduct himself in a manner befitting an officer of the law." (11 Ill. 2d 233, 251.) This policy would seemingly have special meaning in terms of officers on suspension for disciplinary purposes. But, we believe that

a determination of the OPS is not determinative of the issue of whether Hayes was acting within the scope of his employment, however relevant it may be on the issue of the propriety of Hayes' conduct. Moreover, the OPS never charged Hayes with violating the rule against engaging in direct police action while on suspension and, consequently, never made a determination on such an issue. The charge regarding whether Hayes unnecessarily discharged his weapon at the victims is obviously an inquiry into the lawfulness of Hayes' use of force. Therefore, the OPS investigation and determination has no significance to the present action.

■ Plaintiffs further contend that the failure of the city to collect all indicia of police authority from Hayes prior to his suspension is sufficient evidence of negligence on the part of the city as to warrant a reversal of the entry of summary judgment. Plaintiffs' argument is without merit.

Assuming that the city was independently negligent in failing to remove from Hayes all indicia of police authority, the fact remains that Hayes was suspended from his job at the time of the incident and, therefore, had only the same rights and obligations under the circumstances as a private citizen. As this court recently stated in *Galuszynski v. City of Chicago* (1985), 131 Ill. App. 3d 505, 506, 475 N.E.2d 960, albeit in a slightly different context, "the duty of the police is to preserve the well-being of the community at large, and *** such duty is generally not owed to specific individuals." In the general social context of protecting the public from criminal behavior, that rule "embodies the conclusion that a police department's negligence—its oversights, blunders, omissions—is not the proximate or legal cause of harms committed by others." (*Porter v. City of Urbana* (1980), 88 Ill. App. 3d 443, 445, 410 N.E.2d 610.) Similarly, in the present factual setting, the omission by the city was neither the proximate or the legal cause of the injury suffered by plaintiffs. The causal connection between the failure of the city to strip Hayes of his star, shield and identification card led him to believe he had the right to carry the firearm used in the shooting of the two victims by Hayes is, at best, extremely tenuous.

■ Plaintiffs maintain, however, that based upon the uncontroverted affidavit of their expert, reversal is warranted on this issue. Donald Mayo, plaintiffs' expert, opined in his affidavit that it "is reasonable to believe that Officer Hayes would not have further jeopardized his position by carrying a firearm without proof of authority to do so, and authorization to be armed" and that "the failure of [the] Chicago Police Department to take Officer Hayes' star,

shield and identification card proximately led to the shooting of William Bauer and Herbert Patz." Assuming that plaintiffs' expert's opinion would be admissible under Supreme Court Rule 191 (87 Ill. 2d R. 191), it does not establish that the city's negligence created any more than a mere possibility of the resultant injuries. We rule as a matter of law that the natural and probable result of the city's negligence, which is the touchstone analysis regarding proximate cause, was the mere creation of a passive condition making injury possible. "If a negligent act or omission does nothing more than furnish a condition making an injury possible, and such condition, by the subsequent independent act of a third person, causes an injury, the two acts are not concurrent and the existence of the condition is not the proximate cause of the injury." (*Briske v. Village of Burnham* (1942), 379 Ill. 193, 199, 39 N.E.2d 976.) The acts of Hayes are an efficient intervening cause in the condition created by the city such that the condition so created by the city is not the proximate cause of the injury suffered.

■■ Finally, plaintiffs argue that section XIV of Police General Order 75—22, discussed above, should be construed to mean that if direct police action is necessary, a suspended police officer is still on duty, required to assist as necessary, and is acting within the scope of his authority as he assists in the action. This court finds plaintiffs' contention untenable in light of the explicit language of the rule. Section XIV provides in full:

"XIV. Status of Sworn Members While On Suspension

A. A sworn member of the department will not carry a firearm while on suspension.

B. A sworn member of the department is bound by the Rules and Regulations of the Chicago Police Department while on suspension, *except those rules and regulations which require the exercise of direct police action by a member.*" (Emphasis added.)

As discussed earlier, police rules require an officer to be on duty 24 hours a day, even if the officer is finished with his shift and is technically off duty. The nature of police work warrants that such a demand be placed on sworn officers. (See *Karas v. Snell* (1957), 11 Ill. 2d 233, 252.) While officers are suspended from employment for disciplinary reasons, however, it is the policy of the department, clearly articulated in section XIV, that all such officers continue to abide by the rules and regulations of the department *excluding* those rules which require direct police action. Plaintiffs' construction of the rule is the exact opposite of the clear and apparent meaning.

Moreover, plaintiffs' construction is illogical. While an officer is suspended from his duties for disciplinary reasons, the department has a substantial interest in keeping that officer from engaging in any police activity, especially an activity classified as "direct police action." A police officer suspended for disciplinary reasons has, by definition, engaged in conduct contrary to the high moral and ethical standards required by the department and demanded by society. Logic suggests that such an officer should not be participating in police work until the period of his suspension has expired and the officer has regained, theoretically, the necessary high moral and ethical standards with which to conduct himself. The proposition advanced earlier, that a suspended police officer cannot, as a matter of law, be considered acting within the scope of his employment, will facilitate adherence to section XIV because officers will know that they will be held individually liable for their misconduct. Therefore, this court rejects plaintiffs' proposed construction of section XIV, notwithstanding the supposed contradictory testimony cited by plaintiffs in support of such construction. The language of section XIV is clear regardless of any statements made by policemen under the questioning of plaintiffs' attorney during a deposition. A review of the transcripts demonstrates that the officers questioned were either unfamiliar with the exact language of the rule or have had their testimony put to a strained interpretation.

Plaintiffs make no argument in support of reversing summary judgment as to their civil rights count and we, therefore, deem any argument or theory as to such count waived. This court will not search the record for unargued and unbriefed reasons to reverse the trial court. When seeking a reversal, the appellant's failure to pursue a theory with citation to authorities results in a waiver. *Saldana v. Wirtz Cartage Co.* (1978), 74 Ill. 2d 379, 386, 385, N.E.2d 664.

The decision of the trial court is affirmed.

Affirmed.

PERLIN and HARTMAN, JJ., concur.